IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

RUDY RODRIGUEZ,               §
                              §
            Plaintiff,        §
                              §        CIVIL ACTION NO.
    vs.                       §        4:03-CV-055-Y
                              §
CONAGRA GROCERY PRODUCTS      §
COMPANY,                      §
                              §
            Defendant         §

## BRIEF IN SUPPORT OF PLAINTIFF'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Donald E. Uloth
  State Bar No. 20374200
Uloth & Peavler, L.L.P.
2626 Cole Avenue, Suite 400
Dallas, Texas 75204
(214) 665-9530
fax: (214) 665-9531

*Attorney for Plaintiff*

### Table of Contents

I.  Summary of the Motion ............................................................................ 1
II. Summary of Applicable Law .................................................................... 2
     A.     Plaintiff's Case ................................................................... 2
     B.     ConAgra's Affirmative Defense .................................................... 3
III. Facts ............................................................................................ 4
     A.     The Job Offer ................................................................... 4
     B.     About Diabetes ................................................................. 5
     C.     Plaintiff's Condition ............................................................ 7
     D.     ConAgra's Physical Examination ................................................ 8
     E.     ConAgra Withdrew the Job Offer ............................................... 10
     F.     ConAgra's Misperception of Plaintiff's Condition was a Motivating
            Factor Behind its Decision ..................................................... 12
IV. Argument .......................................................................................... 13
     A.     Summary Judgment Standards ................................................... 13
     B.     The Applicable Statutes ......................................................... 13
            1.    *Impairment* ................................................................. 14
            2.    *Regarded As* ................................................................. 14
            3.    *Major Life Activities* ......................................................... 15
            4.    *Substantially Limits* ......................................................... 15
     C.     ConAgra Perceived the Impairment as Substantially Limiting .................. 16
     D.     Qualified ...................................................................... 17
     E.     Motivating Factor .............................................................. 17
     F.     ConAgra's Affirmative Defense .................................................. 18
            1. *Direct Threat* ................................................................. 19
                a.  ConAgra did not assess the degree of risk ............................. 20
                b.  ConAgra Did Not Consider any Reasonable Accommodation ...... 21
                c.  ConAgra Did Not Rely on Current Technology and
                    Medical Knowledge ................................................... 21
                d.  Doctors who have done individualized assessments confirm
                    that Rudy was not and is not a safety risk ........................ 23

# Index of Authorities

## Federal Cases

*Brown v. Lester E. Cox Medical Centers*, 286 F.3d 1040 (8th Cir. 2002) …………………..…16

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)  …...……………………………………………..13

*Children's World Learning Centers, Inc. v. Rizzo*, 84 F.3d 758 (5th Cir. 1996) ………………17, 18

*Deane v. Pocano Medical Center*, 142 F.3d 138 (3d Cir. 1998) (en banc) …………………...….23

*EEOC v. Chrysler Corp.*, 917 F.Supp 1164 (E.D. Mich. 1996),
*rev'd on other grounds* 172 F.3d 48 (6th Cir. 1998) …………………………………………1, 2, 4, 20, 21

*EEOC v. Exxon Corp.*, 203 F.3d 871 (5th Cir. 2000) …………………………………………….3, 19

*Holiday v. City of Chattanooga*, 206 F.3d 637 (6th Cir. 2000) ……………………………...….14

*Melton v. Teachers Ins. & Annuity Ass'n of Am.*, 114 F.3d 557 (5th Cir. 1997) ……………...….13

*Ragan v. Jeffboat, LLC*, 149 F.Supp.2d 1053, 1071 (S.D. Ind. 2001) …......................................23

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) …..............................................................15

*Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180 (3rd Cir. 1999) …………………………...…15, 16, 23


## State Cases

*Chevron Corp. v. Redmon*, 745 S.W.2d 314 (Tex. 1987) ……………………………………...….15

*NME Hospitals, Inc. v. Rennels*, 994 S.W.2d 142 (Tex. 1999) …................................................13

*Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480-481 (Tex. 2000) …..................................3

*Union Carbide Corp. v. Mayfield*, 66 S.W.3d 354 ….................................................................15
(Tex. App.—Corpus Christi 2001, pet. denied)


## Statutes

Americans with Disabilities Act of 1990

    42 U.S.C.§ 12111(3) …..............................................................................................3, 19

42 U.S.C. § 12113 ...........................................................................................3, 18

42 U.S.C. § 12113(a)........................................................................................19

42 U.S.C. § 12113(b) ..................................................................................18, 19

Texas Labor Code, chapter 21

§ 21.001(3) ...................................................................................................13

§ 21.002(6) ...................................................................................................13

## Rules

Fed. R. Civ. P 56 (c) ......................................................................................13

## Miscellaneous

29 C.F.R. § 1630.1 *et seq.* ..............................................................................14

29 C.F.R. § 1630.2(h) ....................................................................................14

29 C.F.R. § 1630.2(i) ................................................................................15, 16

29 C.F.R. § 1630.2(j)(3)(i) .................................................................................16

29 C.F.R. § 1630.2(r) .................................................................19, 20, 21, 22

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

RUDY RODRIGUEZ,                          §
                                         §
            Plaintiff,                   §
                                         §        CIVIL ACTION NO.
      vs.                                §        4:03-CV-055-Y
                                         §
CONAGRA GROCERY PRODUCTS                 §
COMPANY,                                 §
                                         §
            Defendant                    §

**BRIEF IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

The evidence presented herein shows that ConAgra Grocery Products Company discriminated against Plaintiff because ConAgra erroneously believed that he had a disability.

## I. SUMMARY OF THE MOTION

The Plaintiff has diabetes. He worked as a temporary for several weeks doing manual labor at the Ranch Style Beans factory in Fort Worth, Texas, and he performed so well that he was offered permanent employment. But after a cursory physical examination, which did not even include a blood test, ConAgra withdrew the job offer because the company determined that Plaintiff's diabetes was "uncontrolled," which made him a safety risk.

A urinalysis cannot reveal if diabetes is uncontrolled or the diabetic unsafe. In *EEOC v. Chrysler Corp.*, 917 F.Supp 1164 (E.D. Mich. 1996), the district court ruled as a matter of law that three blood tests over a 32-day period was insufficient, and that Chrysler Corporation had failed to meet its statutory to conduct an individualized assessment of the employee's ability to perform the essential functions of the job.

1

Liability in this case is even clearer. ConAgra could have done a blood test, but it did not because a blood test is not part of the standardized package that the company pays for when doing pre-employment physicals. There is no way for an employer to make an individualized assessment of a diabetic using a standardized physical that does not include a blood test. Thus, not only has Plaintiff suffered, but other diabetics who apply for work at ConAgra risk similar discrimination because the company does not do blood tests, and it does not tailor its pre-employment physical to the particular circumstances of the applicant. This will have a disproportionately negative effect on minority groups, such as Hispanics and African-Americans, who have a higher rate of diabetes than Caucasians. Appendix p. 182 lines 6-12.

There are no material questions of fact on liability. The Court should therefore render judgment as to liability and issue an injunction against ConAgra requiring that they may not deny employment to any diabetic applicant or offeree without performing a test called a Hemoglobin A1c.

## II. SUMMARY OF APPLICABLE LAW

A.    **Plaintiff's Case**

Plaintiff must prove three things to establish liability. *EEOC v. Chrysler Corp.*, 917 F.Supp 1164, 1167 (E.D. Mich. 1996), *rev'd on other grounds* 172 F.3d 48 (6th Cir. 1998) (reversing because Chrysler later gave plaintiff a job). First, that that he has a "disability" as defined by the Texas Labor Code. This definition includes being "regarded as" having a disability, and ConAgra believed Plaintiff was unfit for any conceivable kind of work. Second, Plaintiff must prove that he was qualified for the position. Plaintiff proved this by doing the job well enough to get a job offer, and ConAgra's representative has testified that Plaintiff was able to perform all of the essential job functions. Third, Plaintiff must show that his disability was a

motivating factor for the employer's decision to discriminate. *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480-481 (Tex. 2000) (holding the "motivating factor" standard applies to discrimination claims under chapter 21 of the Texas Labor Code). ConAgra admits that its perception of Plaintiff's diabetes was the sole cause for its decision.

**B.    ConAgra's Affirmative Defense**

The Americans With Disabilities Act provides a defense if the employer can show that its decision was justified as a business necessity. 42 U.S.C. § 12113(a). In *EEOC v. Exxon Corp.*, 203 F.3d 871 (5th Cir. 2000), the Fifth Circuit clarified what an employer must show to prove this defense. Exxon had an across-the-board rule that employees who had undergone substance abuse treatment could not hold certain jobs, and the Fifth Circuit held that reasonable restrictions such as this were perfectly legal. *Id.* at 873. However, the Court noted, in the absence of an applicable rule the employer must assess whether the individual applicant poses "a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113; *Id.*

ConAgra did not have a rule for glucose test results, so *Exxon* dictates that its affirmative defense must pass the direct threat analysis. ConAgra has never pled a "business necessity" or "direct threat" defense, but in an interrogatory answer it has stated that Plaintiff was a safety risk. Appendix p. 13 ("Plaintiff had uncontrolled diabetes, which caused ConAgra concern over the safety of Plaintiff and its other employees.") Therefore, in anticipation that ConAgra may oppose this motion based on safety concerns, direct threat will be addressed herein even though ConAgra has waived it.

To raise a question of fact on its direct threat defense, ConAgra would have to show: (1) that it made an individualized assessment of Plaintiff's condition; and (2) that Plaintiff's

condition made him a "direct threat" to other employees if he had been given the job. *See Chrysler Corp.*, 917 F.Supp. at 1170-71. There is no evidence supporting either element.

## III. FACTS

**A.**     **The Job Offer**

ConAgra Grocery Products Company ("ConAgra") owns and operates the Ranch Style Beans plant in Fort Worth, Texas. Appendix p. 22 line 24 to p. 23 line 13. During the period relevant to this case (February to March 2002) ConAgra had a contract with a staffing agency, and it did not hire new employees unless they first worked approximately 45 days as a temporary through the staffing agency. Appendix p. 29 lines 21–25; p. 32 lines 11–23. ConAgra also had a collective bargaining agreement in effect describing the various jobs at the factory, and limiting new hires to one of two entry-level positions doing manual labor. Appendix p. 31 line 19 – p. 32 line 10.

Consistent with ConAgra's hiring practices, Plaintiff first worked at the factory in the production area (one of the entry-level assignments), but as an employee of the staffing agency. Appendix 43 lines 2 – 20. Based on the quality of his work, Plaintiff's supervisor recommended that ConAgra should offer Plaintiff a job. The recommendation was approved and ConAgra offered Plaintiff a job in the production area as a "Production Utility," which was one of the two entry-level positions. Appendix p. 47 line 5 – p. 48 line 21; and p. 51 line 3 – p. 52 line 6. ConAgra has a two-page job description listing the essential functions of this job. Appendix pp. 94-95. Plaintiff was qualified for the position, and he lacked none of the skills for the essential functions of the job. Appendix p. 51 line 13 – p. 52 line 6; p. 76 line 23 – p. 77 line 10; p. 78 lines 4–24. The concern was over safety, not qualifications. Appendix p. 78 line 25 – p. 79 line 9.



ConAgra conditioned its job offer on Plaintiff passing a physical and a drug test. Appendix p. 51 line 20 – p. 52 line 2. ConAgra's human resources director, Elza Zamora, told Plaintiff to go to Occupational Health Solutions ("OHS") for the physical and drug test. Appendix p. 54. On March 1, 2002 Plaintiff went as instructed to the OHS clinic. Appendix page 2, ¶ 4. A staff member at OHS took some information from Plaintiff, and noted on Plaintiff's chart that he took medications for high blood pressure and diabetes. Appendix pp. 2, 112, and 141 ("Current Rx's Meds for ↑ BP & Diabetes").

**B.    About Diabetes**

Diabetes is an incurable disease affecting the way the body uses food. It causes glucose levels in the blood to be too high. Normally, during digestion, the body changes sugars, starches, and other foods into a form of sugar called glucose. The blood carries this glucose to cells throughout the body where, with the help of insulin (a hormone produced by the beta cells in the pancreas), glucose is changed into quick energy for the cells to use or store for future needs. This process of turning food into energy is crucial because the body depends upon this energy for every action, from pumping blood and thinking to physical activities such as running and jumping. Appendix p. 5, ¶ 6; p. 175-176.

In a person with diabetes, something goes wrong with the normal process of turning food into energy. A diabetic digests food into glucose readily enough, but there is a problem with insulin. In type 1 diabetes, the pancreas stops making insulin, or it makes only a tiny amount. In type 2 diabetes the pancreas makes some insulin, but either it makes too little or the body has trouble using the insulin, or both. When insulin is absent, or ineffective, the cells cannot properly use the glucose in the bloodstream to make energy. Instead, glucose collects in the blood,

leading to the high glucose levels or "hyperglycemia," which is the defining characteristic of untreated diabetes. Appendix p. 6, ¶ 7.

Because type I and type II diabetes are incurable, the treatment goal for a diabetic is to maintain his blood sugar within a certain range. For most type I diabetics this requires insulin injections, which creates the risk that the person's blood sugar levels will drop (hypoglycemia). Diabetics who take insulin must be careful not to let their blood sugar drop suddenly, because this could cause one to pass out, or worse. Treatment regimens for type II diabetics vary greatly depending on the individual, and many type II diabetics can control their blood sugar levels through proper diet and exercise, without medication. The health and safety concerns for a type II diabetic are mostly long term. If glucose levels remain elevated for long periods of time, the excess glucose in the body can damage various organs and systems within the body. However, in the short term there is absolutely no health or safety risk posed by elevated, even high blood glucose levels. A person's blood sugar level would have to get up above 600 to 700 milligrams of glucose per deciliter of blood before a person would start being at risk for short term complications such as passing out or diabetic coma. Appendix p. 6, ¶ 8; p. 199-207.

For decades blood glucose levels have been measured using blood tests that measure milligrams of glucose per deciliter of blood. Glucose levels vary constantly depending on a multitude of factors, including when the person last ate, what they ate, their individual metabolism, and their activity level. Thus, glucose tests usually distinguish between a fasting glucose test (where the person has not eaten for at least eight hours) and non-fasting. For a fasting blood glucose test, a score of 60 to 110 is considered normal; anything between 110 and 126 is considered borderline, and anything over 126 is considered to be diabetic. Appendix pp. 6-7, ¶ 9; p. 176.

Another test, which has been widely available for over a decade, is the hemoglobin A1c. This test measures the amount of glucose that adheres to the red blood cells in the body. Because these cells last for up to three months before they are flushed out of the bloodstream, the A1c can shows what a person's blood sugar level has been on the average over a two to three month period. Also, because it measures glucose differently, it makes no difference whether the person has been fasting or not. For a diabetic, the goal is to keep one's score on the A1c at 7 or below. Appendix p. 7, ¶ 10.

The two blood tests described above are the best ways to check a person's blood glucose levels. A urinalysis does not measure a person's blood glucose level at all and it cannot tell a physician anything about whether a diabetic is controlling his condition. All the urinalysis does, as it relates to glucose, is to measure the density of the glucose levels present in the urine. Thus, while a urinalysis might reveal the fact that glucose is spilling out into the urine, it cannot measure the blood glucose or provide any meaningful information about the person's glucose control over time. It might simply mean the person just drank a Coke or a glass of orange juice. Appendix p. 7, ¶ 11; p. 208-211. A physician should not make decision regarding diabetes based on a urinalysis. Appendix p. 211-220.

C.    **Plaintiff's Condition**

From his medical records, Rudy's condition is well known. According to the records, Rudy had the following scores:

| Date | Fasting Blood Glucose | Hemoglobin A1c |
|------|----------------------|----------------|
| 2/22/2000 | **296** | **12.4** |
| 5/6/2000 | **238** | |
| 10/6/2000 | **221** | |
| 5/5/2001 | **312** | |
| 5/18/01 | **146** | **10.6** |
| 8/7/2001 | **139** | **7.7** |

| | | |
|---|---|---|
| 3/1/2002 | **???** | |
| 12/3/2002 | **73** | |
| 12/27/2002 | **97** | |
| 5/5/2003 | **108** | **6.9** |
| 5/20/2003 | **86** | **6.9** |

Appendix p. 8.  Even at the highest blood sugar levels shown above, Plaintiff was not at risk of becoming dizzy, passing out, or suffering any physical or mental impairment of any kind.  Appendix p. 8, ¶ 13.  Over time Plaintiff gained greater control over his blood sugar levels, especially after May 5, 2001 when Dr. Garcia switched his medication to Glucovance.  Just two weeks after switching to Glucovance his fasting blood glucose dropped from 312 to 146, and at all times thereafter Rudy has maintained his blood sugar at acceptable levels.  Appendix p. 8, ¶ 13.

Plaintiff has never suffered any complications from diabetes.   Appendix pp. 1-3 (Affidavit of Rudy Rodriguez); p. 8 ¶ 14.  A few months prior to the pre-employment physical at ConAgra, Dr. Garcia had an appointment with Plaintiff and wrote in his notes that the diabetes and high blood pressure "have been pretty well controlled."  During 2002, the year in which the discrimination occurred, Plaintiff's fasting blood sugar level was consistently near, or below, 100, which is within the normal range even for a non-diabetic.  Appendix pp. 8-9, ¶ 15.

**D.     ConAgra's Physical Examination**

The doctor at OHS who did the physical, Jerry W. Morris, D.O., had very little information to work with.  Dr. Morris did not know that Plaintiff had already been working at the Ranch Style Beans factory for several weeks doing heavy manual labor in the production department.  Appendix p. 128 lines 21–24.  Dr. Morris was supposed to assess whether Plaintiff was medically qualified for the position, *but he did not even know what the position was:*

Q:     Do you know what job he was applying for?
A:     No.

8

> Q:    Have you ever been to the Ranch Style Beans factory where he had been offered employment?
> A:    No.
>
> Q:    Do you know what kinds of machinery he would be working around?
> A:    No.
>
> Q:    Or what kinds of equipment?
> A:    No.

Appendix p. 123, lines 6-15.  Morris did not have the job description listing the essential functions of the position, or any information regarding restrictions unique to that position. Appendix p. 109 lines 4–6; p. 110 lines 2-4.

The physical exam and oral medical history taken by Dr. Morris confirm that Rudy was not physically or mentally impaired by diabetes.  Rudy told Dr. Morris that his diabetes was controlled and that it had *never* caused him any problems.  Appendix p. 2, ¶ 5, p. 114 lines 12–13; p. 133 lines 8–13.  Likewise, during the physical Dr. Morris observed no ill-effects attributable to diabetes:

> Q:    During your examination, did you observe any impairment of him mentally or physically from his diabetes?
> A:    **No.**

Appendix p. 114 line 25 – p. 115 line 2.  A urinalysis showed an elevated concentration of glucose in Rudy's urine, Appendix p. 143 (Morris Deposition Exhibit 2), but Morris personally observed no signs that Plaintiff was impaired in any way by this:

> Q:    … what was it about the elevated glucose level … what effect was that having on Rudy Rodriguez?
> A:    As I stated, none that I could discern on his physical exam that day.

Appendix p. 130 line 23 – p. 131 line 3.

A urinalysis will reveal whether the patient has glucose in his urine, but it does not tell the physician anything about the patient's blood sugar level or his control over time.  Appendix p. 309 lines 2-19.  OHS could have, but did not do, a blood test on Plaintiff:[1]

> Q:    Did – did you do a blood test on Mr. Rodriguez?
> A:    No.
>
> Q:    Do you have glucose meters for blood testing at Occupational Health Solutions?
> A:    Yes.
>
> Q:    But that just isn't part of the package when you do a pre-employment physical?
> A:    That's correct.

Appendix p. 117 lines 3–11.  A glucose meter is the standard measurement for assessing glucose control, not a urinalysis.  Appendix p. 309, lines 9-12.

After the exam Dr. Morris completed a Medical Qualification form.  He checked the box next to the statement "Not medically qualified to perform this job," and in the comments section he wrote "Uncontrolled diabetes."  Appendix p. 117 and p. 144 (the form).  Thus, without doing a blood test, and in spite of the fact that Dr. Morris saw no evidence that diabetes was affecting Rudy, ConAgra took away Rudy's job and the benefits that would have paid for his medication.

## E.    ConAgra Withdrew the Job Offer

Plaintiff took the Medical Qualification form back to the HR manager at ConAgra.  Appendix p. 2, ¶ 6.  Ms Zamora told Rudy that he would not be hired because Dr. Morris "was not medically recommending him for employment."  Appendix p. 61 line 11 – p. 62 line 11.

Zamora's testimony shows that she was not familiar with diabetes, or with the qualifications required for the position that had been offered to Plaintiff.  She never asked Dr. Morris what he meant by "uncontrolled diabetes," and she did not consult with anyone else.  She

---

[1] The physical exam did not include a blood test.  Appendix p. 58 lines 12–14 (Zamora Deposition).

simply assumed based on her own anecdotal experience with diabetes that "uncontrolled" meant a diabetic who was not taking any medication. Appendix p. 69 lines 2 – 25; p. 82 line 3 – p. 83 line 1. Her assumption is incorrect because, as both Dr. Morris and Dr. Garcia testified, not all diabetics need to take medication. Appendix p. 6, ¶ 8 (Garcia Affidavit); p. 115 lines 16–17 (Morris Deposition). Zamora further testified that she would not hire a diabetic to work at Ranch Style Beans unless the person was taking medication to control their diabetes. Appendix p. 86 line 3 – p. 87 line 14. Thus, without an injunction ConAgra is likely too continue to make hiring decisions regarding diabetics based on misperceptions and erroneous assumptions.

As for her knowledge of the position, Zamora was nearly as uninformed as Dr. Morris:

> Q:   Can you give me an idea of, you know, what a production utility employee does during an average workday?
> A:   No, I couldn't.

Appendix p. 37 lines 15–18. When dealing with a new applicant Zamora admits she is unable to describe the duties of the entry-level positions and that she simply refers the applicant to the written job description. Appendix p. 37 line 19 to p. 38 line 16.

Zamora did not evaluate the nature of the perceived risk. When asked: "did you quantify it in some way" she replied: "I was relying on Dr. Morris." Appendix p. 79, lines 21-25. Zamora does not know whether Dr. Morris or anyone else for that matter, performed such an analysis of the nature and severity of the risk, and Zamora had no idea whether the risk was slight or great. Appendix p. 80 line 3 – p. 81 line 1.

After getting the EEOC charge, Zamora asked for a letter from Dr, Morris but she did not reconsider the decision or ask for any additional testing, such as a blood test. Appendix p. 66 line 1 – p. 67 line 11. At no point did either Zamora or Morris consider possible

accommodations.   Appendix p. 81 lines 10 – 24 (Zamora); p. 127 line 25 – p. 128 line 4 (Morris).

ConAgra regarded Plaintiff as substantially impaired with respect to several major life activities and unable to perform a broad class of jobs.  When asked about the risks that she was afraid of, she testified that in a manufacturing environment, with running equipment and sharp objects, diabetics "could certainly endanger themselves" and "could hurt themselves."  Appendix p. 71 lines 4-25.  Zamora was afraid that Plaintiff might "become dizzy and possibly blackout." Appendix p. 70 line 12.  Further, she admits that if a diabetic passed out he would not be able to perform several of life's major activities such as seeing, hearing, walking, standing, reasoning, take care of himself, operate equipment, be aware of his surroundings, drive a forklift, communicate, or lift heavy objects.  Appendix pp. 72 – 73.

ConAgra had many types of jobs at its bean factory, but remarkably they insist that Plaintiff was not qualified for *any* position at the plant, or any other conceivable type of job for that matter.  Appendix p. 14 (Interrogatory Answer No. 7) and p. 127 (Morris Deposition).  It is therefore clear that ConAgra regarded Plaintiff as being foreclosed not just from this one job, but from many jobs.

**F.    ConAgra's Misperception of Plaintiff's Condition was a Motivating Factor Behind its Decision**

In response to an interrogatory, ConAgra gives the following explanation for its decision: "Plaintiff was not hired because the physician conducting Plaintiff's post-offer medical exam concluded that Plaintiff was not medically qualified to perform the job due to uncontrolled diabetes."  Appendix p. 13, Interrogatory No. 4.  Thus, ConAgra admits that its perception regarding Plaintiff's condition was not only a motivating cause, it was the sole cause for its decision.

## IV. ARGUMENT

**A.    Summary Judgment Standards**

Rule 56(c) of the Federal Rules of Civil Procedure allows summary judgment when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P 56 (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Melton v. Teachers Ins. & Annuity Ass'n of Am.*, 114 F.3d 557, 559 (5th Cir. 1997). The movant bears the initial burden of identifying those portions of the record that demonstrate the absence of any genuine issues of material fact. *See Celotex*, 477 U.S. at 323. If the issue is one on which the nonmovant bears the burden of proof, then the moving party may prevail by showing an absence of any evidence supporting the non-moving party's case. *See Celotex*, 477 U.S. at 325.

**B.    The Applicable Statutes**

Plaintiff's lawsuit is based on Chapter 21 of the Texas Labor Code. One of the expressly stated purposes of this chapter is to "provide for the execution of the policies embodied in Title I of the Americans with Disabilities Act of 1990 [the "ADA"] and its subsequent amendments." Tex. Labor Code § 21.001(3). Therefore, in order to be consistent with the ADA, Texas courts are guided by the ADA, the EEOC's interpretive guidelines, and federal case law interpreting and applying the ADA. *See, e.g., NME Hospitals, Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999). Most cases cited in the following discussion are federal cases construing the ADA, but they are directly applicable to the Texas statute on which this suit is based.

The Texas Labor Code defines the term "disability" as follows:

> "Disability" means, with respect to an individual, a mental or physical impairment that substantially limits at least one major life activity of that individual, a record of having such an impairment, or being regarded as having such an impairment.

Tex. Labor Code § 21.002(6).

13

The first two parts of this definition – an actual impairment, or a record of an impairment – are not in issue in the present case.   Therefore, for the present case the definition may be broken down as follows:

"Disability" means, with respect to an individual: (1) being *regarded as* having a mental or physical *impairment* (2) that *substantially limits* at least one *major life activity* of that individual.

1.    *Impairment*

The term "mental or physical impairment" is not defined in either the Labor Code or the ADA, but is has been defined by the EEOC in the regulations promulgated to assist in the interpretation and enforcement of the ADA.   29 C.F.R. § 1630.1 *et seq.*   According to the regulations:

(h) Physical or mental impairment means:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and **endocrine**; or

(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h)(emphasis added).   Diabetes is a disorder of the endocrine system, Appendix p. 296, lines 6-17, and clearly fits the definition of the term "impairment."

2.    *Regarded As*

The ADA stands for the principle that people should be judged by their abilities, and they should not suffer discrimination based on misperceptions.   *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000).   Thus, both the ADA and the Texas Labor Code prohibit discrimination based on perceived as well as actual disabilities.

In a "regarded as" case the plaintiff need not prove an actual disability. *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 188 (3rd Cir. 1999) ("Several cases support our conclusion that, in general, an employer's perception that an employee cannot perform a wide range of jobs suffices to make out a 'regarded as' claim.") There are two ways that an employer might regard an employee as disabled: (1) the employer might erroneously the employee has a substantially limiting impairment, when in fact the employee has none; or (2) the employer believes that the employee's non-substantial impairment is much worse than it actually is. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999).

This case involves the latter: Plaintiff has an impairment, but because ConAgra failed to determine the severity of the impairment, it erroneously assumed that the impairment was severely limiting – so severe that it rendered Plaintiff unfit for any conceivable job.

3.    *Major Life Activities*

According to regulations:

"Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."

29 C.F.R. § 1630.2(i). Texas has embraced this definition as applicable to the Texas Labor Code. *Union Carbide Corp. v. Mayfield*, 66 S.W.3d 354, 360 (Tex. App.—Corpus Christi 2001, pet. denied).

4.    *Substantially Limits*

The term "substantially limits" means the impairment must be more than just somewhat limiting, it must be *severely* limiting. *Chevron Corp. v. Redmon*, 745 S.W.2d 314, 318 (Tex. 1987). In a "regarded as" case, this means the employer perceives the employee as being substantially limited. As stated above, this is established where the employer believes that the

employee is foreclosed from a wide range of jobs. *Taylor*, 177 F.3d at 188 (3rd Cir. 1999). Zamora's testimony also shows her perception that Plaintiff was substantially limited in other major life activities.

## C.    ConAgra Perceived the Impairment as Substantially Limiting

ConAgra perceived the impairment to be substantially limiting in several major life activities. Zamora feared that Rudy might "become dizzy and blackout." Appendix p. 70 line 18. Her concern was that Plaintiff might blackout and harm himself. Appendix p. 71 lines 21–25. She agreed that if this happened, Plaintiff would be substantially impaired in several major life activities such as: seeing, hearing, walking, standing, conscious reasoning, taking care of himself, and communicating. Appendix pp. 72 – 74. These are defined as major life activities. 29 C.F.R. § 1630.2(i); *Brown v. Lester E. Cox Medical Centers*, 286 F.3d 1040, 1045 (8th Cir. 2002) (the "ability to perform cognitive functions on the level of an average person" is a major life activity).

Regarding the major life activity of working, "substantially limits" means:

> … significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.

29 C.F.R. § 1630.2(j)(3)(i). Zamora had concerns about Plaintiff's ability to operate equipment, drive a forklift, or lift heavy objects, and she feared Plaintiff might be unaware of his surroundings and therefore unable to get out of the way if a forklift went by. Appendix p. 74 lines 4-20. Dr. Morris believed that Plaintiff was unfit for *any* job: "outside of a padded room where he could even then fall and break his neck from dizziness or fainting, I don't know that there would be a safe environment that we could construct." Appendix p. 32 lines 18–21. He

16

testified that *any person* whose urinalysis was at the same level as Plaintiff's would not be medically qualified for any manual labor job. Appendix p. 125 lines 17–21.

Astonishingly, Dr. Morris did not even know what job Plaintiff was applying for. He says he assessed the risk that Plaintiff might pose "on any job," even desk jobs, and concluded it was too risky. Appendix p. 126 line 23 – p. 127 line 24. All of this was based on one urinalysis:

    Q:    All of that was based on the urinalysis?
    A:    The risk was based on the urinalysis, correct.

Appendix p. 127 lines 23 – 24. This conclusively establishes that, when it came to the major life activity of working, ConAgra viewed Plaintiff as being foreclosed from a class of jobs or a broad range of jobs within a class.

## D.    Qualified

There is no question of fact regarding Plaintiff's qualifications to do the job. He did the job for several weeks, and did it so well that he received an offer of permanent employment. According to Zamora:

    Q:    Did you believe that he [Plaintiff] lacked any of the skills, any of the essential job functions listed on the job description to work at ConAgra?
    A:    No.

Appendix p. 77, lines 7-10. Her concern was not Plaintiff's qualifications, but rather the potential for injuries and safety. Appendix p. 78 lines 1-3. Zamora admitted that, but for the opinion of Dr. Morris, Plaintiff would have been given the position. Appendix p. 80. It is therefore undisputed that Plaintiff was qualified to perform the essential functions of the position.

## E.    Motivating Factor

Most courts apply a burden-shifting analysis in discrimination cases, unless there is direct evidence of discrimination. For example, in *Children's World Learning Centers, Inc. v. Rizzo,*

84 F.3d 758 (5th Cir. 1996), the employer admitted to removing the plaintiff from her duties as a bus driver because of plaintiff's hearing impairment. This eliminated the need for a burden-shifting analysis, and the only remaining question was whether the plaintiff posed a direct threat to the safety of others.

The same logic applies to the present case. ConAgra readily admits having withdrawn the job offer because Plaintiff had diabetes. Like the employer in *Children's World*, ConAgra argues that Plaintiff posed a direct threat to the safety of others. There is therefore no need to conduct a burden-shifting analysis, and the sole remaining question becomes whether there is sufficient evidence to justify a trial of ConAgra's "direct threat" defense.

**F.    ConAgra's Affirmative Defense**

The ADA provides employers with a defense if they can show that the employee was a "direct threat" to the health or safety of other workers. 42 U.S.C. § 12113(b). The Texas Labor Code does not include this defense, and there are no Texas cases adopting it, but common sense dictates that it should apply under state law as well. ConAgra has not pled this defense and the deadline for seeking leave to amend pleadings has long passed, so it may not be raised in opposition to this motion. However, anticipating that ConAgra will make safety-related arguments, the issue will be addressed in this motion.

The ADA states, in relevant part:

§ 12113. Defenses

(a) In general.
It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tends to screen out or otherwise deny a job or benefits to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.

(b) Qualification standards.
The term "qualification standards" may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.

42 U.S.C. § 12113(a) and (b).

In interrogatory answers ConAgra has stated that Plaintiff's diabetes "caused ConAgra concern over the safety of Plaintiff and its other employees." Appendix p. 13, Answer to Interrogatory No. 3. ConAgra is not claiming that it had an across-the-board rule that was applied in this case, so as discussed above on p. 3 any safety issue must be analyzed under this direct threat defense. *EEOC v. Exxon Corp.*, 203 F.3d 871, 873 (5th Cir. 2000).

      1.    *Direct Threat*

The ADA defines the term "Direct threat" as: "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). The regulations expand on this definition and show that an employer must take certain affirmative actions in determining whether an applicant poses a direct threat. According to the regulations:

> Direct Threat means a **significant risk** of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a "direct threat" shall be based on an **individualized assessment** of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on **the most current medical knowledge and/or on the best available objective evidence**. In determining whether an individual would pose a direct threat, the factors to be considered include:
>
> (1) The duration of the risk;
> (2) The nature and severity of the potential harm;
> (3) The likelihood that the potential harm will occur; and
> (4) The imminence of the potential harm.

29 C.F.R. § 1630.2(r)(emphasis added).

This definition creates several duties on the part of the employer – duties that ConAgra simply ignored.

      a.     <u>ConAgra did not assess the degree of risk</u>

Before withdrawing Plaintiff's job offer, ConAgra had a duty to assess the degree of the potential risk. The definition of "direct threat" uses the term "significant risk," which the ADA defines as a "high probability of substantial harm." 29 C.F.R. § 1630.2(r). As stated in *Chrysler Corporation*, "[a] slightly increased risk is not enough." 917 F.Supp. at 1170.

Dr. Morris testified that when he did the physical, he did not observe any effects of diabetes. Appendix p. 130 lines 15 – p. 131 line 3. By law ConAgra was supposed to assess the four factors listed in the definition of direct threat, but Dr. Morris conceded in his deposition that he was not thorough in this regard. Concerning duration, Morris testified:

> Q.     Did [your assessment] take into account the duration of this risk that Rudy might pose?
> A:     No.

Appendix p. 29 lines 3–5. Concerning the nature and severity of the possible harm, Morris said he thought Plaintiff was a safety concern, and then:

> Q.     Did you assess the level of severity of that safety concern?
> A:     No.

Appendix p. 120, lines 6–8. Concerning the likelihood of the potential harm Morris testified:

> Q.     How likely do you think it was that Rudy would faint or become dizzy and suffer some potential harm or cause harm?
> A:     I don't have a quantitative answer for that. Qualitatively, I believe there was sufficient risk that I wasn't willing to assume that risk for him.

Appendix p. 121 lines 21–25. Concerning the fourth factor, imminence of the potential harm, Morris testified:

> Q.    And did you have an opinion about if – if Rudy went to work at ConAgra
>       whether he was likely to cause an injury in the first week, the first year,
>       the first ten years, anything like that?
> A:    No.

Appendix p. 122 lines 1–5.  Morris went on to say that he did consider the imminence of the

potential harm, but really all he did was speculate because, as he admitted, he said he "can't

pinpoint in the future what might happen."  Appendix p. 122 line 17.  Thus, by his own

admission, Morris did not adequately consider *any* of the four factors required by law when

assessing the severity of the risk that Rudy Rodriguez might have posed.   "A speculative or

remote risk [of harm] is insufficient."  *Chrysler Corp.*, 917 F.Supp. at 1170.

> b.    ConAgra Did Not Consider any Reasonable Accommodation

By definition, the direct threat defense applies only if the risk cannot be eliminated or

reduced by reasonable accommodation.  29 C.F.R. § 1630.2(r).  Dr. DeFronzo testified that there

were several possible accommodations that an employer could provide for a diabetic applicant,

such as a portable glucose monitor.  Appendix pp. 323-326.  Neither Dr. Morris nor Ms. Zamora

considered any possible accommodations.  Dr. Morris testified:

> Q.    Did you consider whether there might be some kind of way to
>       accommodate Rudy's diabetes, so that he could perform his job functions?
>       Ms. Thigpen: Objection, form.
> A:    No.

Appendix p. 127 line 25 to 128 line 4.  Likewise, Zamora testified that she did not consider any

alternatives, such as having Plaintiff use a glucose meter.  Appendix p. 81 lines 10–24.

> c.    ConAgra Did Not Rely on Current Technology and Medical Knowledge

By law ConAgra was obligated to base its assessment "on a reasonable medical judgment

that relies on the most current medical knowledge and/or on the best available objective

evidence."  29 C.F.R. § 1630.2(r).  To assess a diabetic, the best objective evidence is a blood

glucose test.  Appendix p. 309 lines 9-12.  Dr. Morris admits that he could have done a blood test

on Plaintiff, but he did not:

> Q.    Okay.  Did you do a blood test on Mr. Rodriguez?
> A:    No.
>
> Q:    Do you have glucose meters for blood testing at Occupational Health
>       Solutions?
> A:    Yes.
>
> Q:    But that just isn't part of the package when you do a pre-employment
>       physical?
> A:    That's correct.

Appendix p. 117 lines 3–11.  The only objective evidence that Morris relied on was a urinalysis,

which says nothing about a person's blood sugar level.  A urinalysis is simply a snapshot, and it

tells the physician nothing about that person's condition over time.  Dr. Morris admitted that a

high glucose level in the urine could be a temporary spike, and that someone with controlled

diabetes could temporarily have glucose in the urine.  Appendix p. 134 line 12 – p. 135 line 3.

Morris further stated that he did not know if this was the case with Mr. Rodriguez.  Appendix p.

135 lines 4–7.  Dr. Morris did not even ask Plaintiff whether he had been fasting, or what he had

eaten before coming to the physical.  Appendix p. 118 lines 8–12.    Rather than questioning

Plaintiff, doing a blood test, or having Plaintiff come back on another day to get a comparison

over time, Morris admits that he simply made an assumption about Plaintiff's condition over

time.  Appendix p. 134 lines 9–11.

It is also clear that ConAgra did not rely on the most current medical knowledge.  Dr.

DeFronzo read the deposition of Dr. Morris and noted several statements that showed a lack of

knowledge concerning diabetes.  Appendix pp. 312-323.

An employer may not deny employment to someone whose condition poses only a

slightly increased risk of harm.  *See* Appendix to Part 1630, Interpretive Guidance on Title I of

the Americans with Disabilities Act, 29 C.F.R. § 1630.2(r).    Also, in applying these four factors, the employer must conduct an **individualized assessment** of the employee.    The assessment must be based on objective and factual evidence – not subjective perceptions, irrational fears, and stereotypes.    To the contrary, a refusal to hire based on an employer's misperceptions or stereotypes is exactly the kind of employment discrimination that is prohibited under the "regarded as" clause.

In her deposition testimony Zamora suggested that if Plaintiff had provided ConAgra with more information about his condition the decision might have been otherwise.    Appendix p. 72 lines 17–25; p. 79 line 24 to p. 80 line 4.    This shows how ConAgra thus far fails to understand its obligations under state and federal law.    It is the *employer's* duty to conduct an individualized assessment, and the employer cannot escape liability for an erroneous snap judgment by blaming the employee for its lack of thoroughness.    Furthermore, there is no "good faith" defense – even an innocent mistake concerning the plaintiff's abilities can violate the anti-discrimination laws.    *See Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 190-191 (3rd Cir. 1999); *Deane v. Pocano Medical Center*, 142 F.3d 138, 144 (3d Cir. 1998) (en banc); *Ragan v. Jeffboat*, LLC, 149 F.Supp.2d 1053, 1071 (S.D. Ind. 2001).

      d.      <u>Doctors who have done individualized assessments confirm that Rudy was not and is not a safety risk</u>

Plaintiff has been under the care and treatment of Dr. Ramon Garcia since at least 1999, and in connection with this case he has been examined by one of the world's leading experts on diabetes, Dr. Ralph A. DeFronzo at the University of Texas Health Science Center in San Antonio, Texas.    Both doctors were given the statutory definitions of "direct threat" and the term "individualized assessment," and both have concluded that Plaintiff is well qualified for the ConAgra job, that he is not a direct threat to himself or others, and that ConAgra did not conduct

an individualized assessment.   Appendix pp. 9-10 (Affidavit of Dr. Garcia); p. 303-305 (DeFronzo Deposition).

After examining Plaintiff, Dr. DeFronzo concluded: "he's not a direct threat to himself any more than I am a direct threat to myself, and he's not a direct threat to anybody else around him any more than I am a direct threat to anyone else around me." Appendix p. 303. As for qualifications, Dr. DeFronzo testified that as of March 1, 2002, Plaintiff was "perfectly capable of performing any kind of manual labor-type job." Appendix p. 305. Especially since changing medication to Glucovance in May 2001, Plaintiff has had good control over his blood sugar levels. Appendix p. 305-306.

On the question of individualized assessment, Dr. DeFronzo was adamant that the assessment was inadequate. Appendix pp. 307-312. Particularly objectionable was the fact that Dr. Morris relied on a urinalysis when he had a glucose meter available, and Dr. Morris did not inquire regarding possible diabetic complications. Appendix p. 309. In order to meet the legal standard of reliance on the best medical technology, ConAgra should have done a hemoglobin A1c. Appendix p. 311.

WHEREFORE, Plaintiff prays for an order finding that Defendant is liable for violating section § 21.002(6), and enjoining Defendant from rejecting otherwise qualified diabetic applicants without performing a hemoglobin A1c.

Respectfully submitted,

Donald E. Uloth
  State Bar No. 20374200
Uloth & Peavler, L.L.P.
2626 Cole Avenue, Suite 400
Dallas, Texas 75204
(214) 665-9530
fax: (214) 665-9531

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

A true and correct copy of this document has been served by certified mail, return receipt requested, on this 31st day of October, 2003, to Helen Thigpen, Haynes and Boone, L.L.P., 2502 N. Plano Rd., Suite 4000, Richardson, Texas 75082-4101.

Donald E. Uloth

25